## General Electric Co. v. Marianelli

*John W. Bour*, for plaintiff.

*Richard Warren*, for defendant.

HOBAN, P. J., July 14, 1958.—This is an action of assumpsit by plaintiff, both shipper and consignee, against defendant, a common carrier by motor vehicle as the terminal carrier, for damage to goods in transit.

By agreement the case was tried before Hoban, P. J., without a jury.

It is conceded that a joint inspection by authorized employes of plaintiff and defendant after delivery of a shipment of glass rods to the Scranton plant of plaintiff corporation, disclosed that 560 pounds of glass rods in a shipment of over 7,000 pounds had been damaged, the money value thereof being $2,632. The issue turns on whether the carrier, having received the shipment "in apparent good order," ought to be relieved from the responsibility on the theory that defendant has improperly packaged the goods for transportation by motor vehicle, a fact which was impossible of discovery by the carrier, either initial or terminal, because of the particular shipper's method of preparation for shipment.

The shipment in question consisted of boxes of glass rods. Each rod was 48 inches long; the rods were packed in paper boxes of approximately the same length, about six or seven inches wide and five inches deep. Each box contained approximately 22.23 pounds of rods. The packing was done in such a manner that theoretically at least the ends of the rods rested snugly against the interior of the ends of the boxes. No cushioning or any material to protect the ends otherwise was used. Four boxes were then placed in a cardboard carton so fitted as to rest snugly against each other on the inside of the carton, which was then sealed

and strapped with metallic straps. Each of the cartons packed as aforesaid weighed approximately 108 pounds overall. Within the carton there was no other material separating the boxes one from the other or from the interior surfaces of the carton. As so packed this particular shipment of 70 cartons was delivered to the initial carrier, Swaney Transport, at the Bridgeville plant of plaintiff, and by it delivered to the Pittsburgh dock of defendant carrier and there transhipped to one of defendant's over-the-road trailers. Since the shipment would not constitute a complete load, it was placed on the forward end of a trailer containing a miscellaneous shipment. On arrival at Scranton the miscellaneous shipment was "stripped," that is to say, was discharged from the over-the-road trailer and separated for delivery by local trucks to the various consignees in the area. The shipment in controversy was so delivered to the receiving department of the General Electric Tube Plant at Scranton, where it was unloaded by defendant's agents. The method of unloading was to lift the cartons onto skids or pallets. These pallets were then moved by fork lift to a nearby area where they were stacked and stored, awaiting inspection and disposition by plaintiff's agents at the Scranton Tube Plant.

Shortly after delivery as aforesaid the receiving clerk at the Scranton tube plant noticed that some of the cartons appeared to be slightly crushed and pierced. He reported the fact to his superior and asked for speedy inspection. Upon inspection of a few cartons and noticing breakage, the manager of plaintiff's receiving department then called defendant's general manager. They arranged for a joint inspection, as a result of which they agreed that approximately eight pounds of glass in each carton were destroyed and rendered useless. A formal inspection report was made out, signed by Mr. Muska, the head of the receiving

department of the tube plant, and by Mr. Griffith, general manager of defendant carrier. The written report carried these significant items, inter alia:

"Do you consider adequately packed or protected? No.

"What condition of container or contents indicated loss or damage occurred with carrier? Some cartons crushed slightly and pierced.

"To prevent comparable damage in future, how in your judgment should they have been packed or prepared for shipment?

"Merchandise should be packed according to N.M.F.C. This shipment did not conform in several respects, (weight and packing)."

Defendant carrier declined responsibility on the ground that the shipment did not conform to the weight and packaging requirements of the National Motor Freight Classification. This is the document utilized in the trucking business giving the uniform ratings, rules and regulations for freight classification and of which both shipper and carrier are required to be aware by terms of the uniform domestic straight bill of lading. In fact, under the short form straight bill of lading permitted by N. M. F. C., the shipper certifies that he is familiar with all the terms and conditions of the said bill of lading set forth in the classification on tariffs which governs the transportation of the particular shipment, and the said terms and conditions are agreed to by the shipper.

Admittedly, this shipment is classified under N. M. F. C. A-2, effective July 7, 1954, as Item No. 46770: "Rods or tubing, straight, NOI, in boxes; also Vol., in boxes or in bundles wrapped in 2 plies of single-faced corrugated fibreboard, ends protected, bundles securely sealed, net weight of contents not exceeding 50 lbs." I can only read this to mean that in shipments of this classification, whether in boxes or bundles, the rods

and ends must be protected and the net weight of the contents of any particular box should not exceed 50 pounds. Here the "box" was in fact a carton containing four separate smaller boxes, but to all intents and purposes the box delivered to the carrier weighed 108 pounds. Admittedly, the ends were not protected other than by some snugness to the interior surface of the smaller boxes. There is testimony in the record that there was breakage in almost every box, while there were also many rods remaining intact in each box but that the ends were loose.

We have this factual situation, therefore: The carrier accepted shipments which it knew were overweight from the classification prescribed. On delivery a number of packages appeared to be crushed and pierced. It is therefore a fair inference that such crushing and piercing occurred in transit, since the carrier accepted the shipment at point of origin as "in apparent good order . . . (Contents and condition of contents of packages unknown)." If the carrier chose to permit a weight deviation in the packaging requirements for this classified shipment, he could not evade responsibility for damage by that violation of the contract as expressed in the bill of lading. The serious question comes as to whether, in view of the apparent further violation of the shipping requirements by failure to protect the ends of the glass rods, the carrier can now argue that the damage was due to that cause alone, and therefore, under the generally accepted principles of carrier law, "improper packing or preparation for shipment constitutes ordinarily such a fault on the part of the shipper as will relieve a common carrier from its almost absolute liability for goods it undertakes to carry, where the defect or fault is latent and not apparent upon ordinary observation . . .": 9 Am. Jur., Carriers §729.

The principle might be sound and no doubt it is

sound if it is demonstrable that there was no fault in the handling of the shipment on the part of the carrier, but when the carrier's fault is irrefutably demonstrable by the evidence of external damage to the packages in the nature of crushing and piercing, it would seem as a practical matter impossbile for the trier of fact to separate the causes of damage as between the carrier's failure to protect the goods or the improper packaging by the shipper. One thing is certain, the carrier could have protected itself against the probability of loss by restricting the size of the packages to the weight prescribed in the classification. It must be presumed that the persons who arrived at this weight restriction did so on the basis of some knowledge of the risks involved.

On the basis of the reasoning above, we are of the opinion that we are unable to separate or compartment the costs of the damage to the shipment as between that caused by carrier's fault or the shipper's improper packaging methods.

Of course, it must be remembered that the liability of defendant is based upon his common law liability as a common carrier to assure safe delivery of the goods entrusted to his care, and hence the principles of contributory negligence are not applicable.

For the reason above stated, we are obliged to hold that defendant as a common carrier is responsible for the admitted damage to the shipment, and accordingly we must enter judgment for plaintiff.

### Judgment Nisi

Now, July 14, 1958, judgment is entered in favor of plaintiff, the General Electric Company, and against defendant, P. Marianelli, doing business as P. Marianelli Motor Lines, in the sum of $2,632.

The prothonotary is directed to give notice to the parties, or their attorneys, of the filing of this decision

and judgment nisi. Exceptions, if any, to be filed within 30 days from the date of such notice; otherwise this judgment to become final.

## On Exceptions to Judgment Nisi

Before Hoban, P. J., and Eagen and Robinson, JJ.

HOBAN, P. J., December 5, 1958.—In a decision after trial without jury the trial judge held defendant responsible as the terminal carrier for damages to goods in transit. Defendant filed four exceptions to the decision. We are in accord that the exceptions must be dismissed and the judgment nisi be made final.

As to exception no. 1, both the bill of lading and the testimoney of the witness Carl Reese, the "Leadman" at plaintiff's Bridgeville plant, establish that the goods as delivered to the initial carrier were in good order and there is no evidence to the contrary.

As to exception no. 2, the trial judge pointed out that by the terms of the bill of lading both shipper and carrier were bound by the requirements of the National Motor Freight Classification including the individual package weight restrictions. Knowledge of the parties must be held to be communicated to their agents and it is absurd to think that any truck driver entrusted with a valuable cargo cannot tell the difference between a 50-pound package and one weighing over 100-pounds.

In exception no. 3 defendant challenges the trial judge's conclusion that "the carrier's fault is irrefutably demonstrable by the evidence of internal damage to the packages." When a shipment is received by a carrier in apparent good order and is found to be damaged at the end of the journey, the conclusion is warranted that the damage occurred in transit through the carrier's fault. For a typical case, see Beresin v. Pennsylvania Railroad Company, 116 Pa. Superior Ct. 291. The "irrefutable" nature of the evidence arises

from the admitted fact of visible external damage on delivery to consignee, coupled with the unchallenged evidence of initial good condition. See our remarks above as to exception no. 1.

By exception no. 4 defendant seeks to have us impose liability on the shipper on the theory that where there are two possible causes of damage impossible of separation, one of which is the shipper's fault, that the shipper ought to take responsibility for the damage even though the other cause is the carrier's fault. Admittedly the original packaging did not conform to N. M. F. C. requirements as to end protection for the packaged glass rods. But any conclusion that the improper packaging was a cause of the damage must rest on assumption alone, as against positive evidence that many of the cartons were subject to external violence in transit. If the carrier seeks to escape liability for its failure to perform its duty to carry the shipper's goods safely on the ground that it is excepted from liability by shipper's fault, the burden of proof is on the carrier: Villari v. James, 155 Pa. Superior Ct. 155; Arabian American Oil Company v. Kirby & Kirby, Inc., 171 Pa. Superior Ct. 23. The trial judge held in effect that defendant did not sustain the burden, and we concur.

Now, December 5, 1958, the exceptions to the decision and the judgment nisi are overruled, and the judgment nisi heretofore entered is now made final.